917 N.E.2d 1044 (2009)
334 Ill.Dec. 969
In re S.D., a minor, Respondent-Appellee
(The People of the State of Illinois, Petitioner-Appellee, v. Gardenia S., Respondent-Appellee (The Department of Children and Family Services Guardianship Administrator, Appellant)).
No. 1-09-0100.
Appellate Court of Illinois, First District, Fifth Division.
September 30, 2009.
Rehearing Denied November 10, 2009.
*1045 Attorney General, Chicago, IL, Sharon A. Purcell, Assistant Attorney General, for Appellant.
Cook County Public Guardian, Chicago, IL, Robert F. Harris, Kass A. Plain, Mary Brigid Hayes; State's Attorney, Chicago, IL, James E. Fitzgerald, Nancy Faulls, Nancy Kisicki, Assistant State's Attorneys, for Appellee.
Justice FITZGERALD SMITH delivered the opinion of the court:
S.D.'s mother, Gardenia S., filed a petition on November 6, 2007, under the Juvenile Court Act of 1987 (705 ILCS 405/2-33 et seq. (West 2006)), to reinstate wardship and terminate private guardianship of S.D., alleging that S.D. wished to return to her custody. The juvenile court entered an order granting the petition. It also entered an order vacating the private guardianship. After a hearing on December 20, 2007, the juvenile court entered a modified disposition order returning S.D. to his mother, finding her fit, willing, and able. At an August 26, 2008, progress hearing, a Department of Children and Family Services (DCFS) representative assigned to the case reported that Gardenia had been and was unable to handle S.D.'s behavior. On December 8, 2008, another progress hearing was held, during which the both the State and the public guardian argued that S.D. should be returned to the guardianship of DCFS. DCFS, on the other hand, argued that S.D. was ineligible to be returned to DCFS. After continuing the case and hearing more arguments on the issue, the juvenile court modified its dispositional order and placed S.D. in the custody/guardianship of D. Jean Ortega-Piron, the DCFS Guardianship Administrator. DCFS now appeals, arguing that the juvenile court had no statutory authority to *1046 appoint DCFS as S.D.'s guardian. For the following reasons, we affirm.

I. BACKGROUND
S.D. was born on December 22, 1990, and first came to the attention of the juvenile court in April of 1993 when the State filed petitions for adjudication of wardship alleging that S.D. and his siblings were abused and neglected. On May 24, 1993, the court found that S.D. had been abused and neglected as a result of physical abuse inflicted by his mother's boyfriend, and adjudicated S.D. abused and neglected.
On August 10, 1993, the court entered a dispositional order in which it found S.D.'s mother, Gardenia, unable to care for, protect, train, or discipline S.D., and adjudicated S.D. a ward of the court, appointing the DCFS Guardianship Administrator as his guardian. DCFS placed S.D. with his maternal grandmother, but later removed him following allegations of physical abuse. S.D. was placed in the guardianship of DCFS and then in foster care with a nonrelative, Emily Neely.
On August 10, 1996, the court ordered a permanency goal of long-term foster placement for S.D. A 1997 evaluation of S.D.'s mother identified possible organic impairment, and found her to be on the borderline range of intellectual ability, functioning between the third- and fifth-grade levels. The clinical psychologist evaluating Gardenia wrote in her report that given the ages of her children, Gardenia "may be able to provide a safe, stable environment for them."
On January 7, 1998, the court determined that Gardenia was not making reasonable efforts and ordered a permanency goal of private guardianship for S.D. On June 30, 1998, the juvenile court entered an order allowing the mother to have unsupervised day visits with S.D. The next day, however, the court suspended unsupervised visits until further order of the court.
In March of 2000, DCFS filed a motion to vacate its guardianship and place S.D. in private guardianship with Neely. On June 2, 2000, the court ordered that S.D. be placed in private guardianship with Neely and found that it was in the best interest of S.D. to have no further monitoring by the court. DCFS provided a subsidy for Neely. S.D. required psychiatric hospitalization three times, at ages 14, 15, and 16, while in the custody of Neely.
Over seven years later, on November 6, 2007, Gardenia filed a pro se supplemental petition stating:
"[I]n June 2007, the private guardian placed the Minor-Respondent in the care of various relatives due to the Minor's behavior problems and problems within the private guardian's family. On October 25, 2007, the Minor left his last placement with a relative of the private guardian's family. On October 25, 2007, the Minor left his last placement with a relative of the private guardian, and with no other place to live, has been staying with the Respondent-Mother."
Gardenia's petition asked the court to terminate the private guardianship, reinstate the wardship under section 2-33, and return S.D. to Gardenia's full custody and control.
On November 20, 2007, the trial court granted the petition. It vacated Neely's private guardianship and entered a modified dispositional order adjudicating S.D. a ward of the court and placing him in the custody and guardianship of DCFS. The court then continued the matter until December 20, 2007.
On December 20, 2007, a hearing was held by the Honorable Candace Fabri, the juvenile court judge then assigned to *1047 S.D.'s case. S.D. and Gardenia were both present in court. Victoria Davis-Jones, a DCFS worker, testified that she worked with Rodney Spencer, the employee assigned to S.D.'s case. Davis-Jones testified that Spencer visited Gardenia's one-bedroom apartment and that Gardenia told Spencer she lived in section 8 (42 U.S.C. § 1437f (2000)) housing and would apply to get a two-bedroom apartment.
Davis-Jones testified that Spencer enrolled S.D. in a GED program to begin on January 9, 2008, and expected to transfer the case to intact family services for weekly services and DCFS monitoring.
Gardenia, S.D.'s mother, then testified that S.D. had been staying at the DCFS shelter and that he had three weekend visits at her home which went "really well." She stated, "I haven't really known him since he was what since he was three years old so it's been a really wonderful experience to be with him." She testified that her two older sons also had visits "almost every weekend or almost every day" at her home.
The State and the Public Guardian both expressed support for the plan to return S.D. to his mother's custody. The court then entered a modified dispositional order finding Gardenia to be fit, able, and willing to parent S.D. and entered an order of protective supervision. The order of protective supervision required Gardenia to, among other things, provide all care necessary for and ensure proper supervision of, S.D.
S.D.'s case came before the juvenile court for periodic progress reports during 2008, with updates on S.D.'s status provided by DCFS social worker Connie Haygood.
Forensic Clinical Services prepared a psychological summary report dated May 21, 2008, regarding S.D.'s ability to stand trial in a criminal case. S.D. had been charged with aggravated robbery for allegedly stealing an iPod on a bus.[1] The report further indicated that S.D. had experienced periods of depression related to being physically and sexually abused and placed in foster care. S.D. reported that he had angry outbursts and mood swings, that he had been diagnosed with bipolar disorder, and had been psychiatrically hospitalized at the ages of 14, 15, and 16. Testing revealed that S.D.'s intellectual functioning fell within the "borderline" range and suggested that he had a verbal-based learning disorder. The examiner opined that S.D. was not at that time fit to stand trial and recommended therapeutic treatment.
S.D. was hospitalized in Streamwood Behavioral Health Center from July 2, 2008, until November 13, 2008.
On August 26, 2008, Haygood appeared before the court and testified that the aggravated robbery charge against S.D. was still pending and that S.D. was currently at Streamwood Behavioral Health Center. Haygood further testified that Gardenia, S.D.'s mother, no longer wanted custody of S.D. Haygood stated that a psychological evaluation and mental health assessment recommended that S.D. receive intensive psychiatric services. The evaluation also indicated that S.D. was taking medication and making progress, but had "some more work to do in regards to fully understanding the judicial process." Haygood affirmed that S.D.'s mother had expressed that she could not handle S.D.'s behavioral problems upon his release.
*1048 The trial court expressed concern that DCFS had "raised this child from the age of two," that he had been returned to his mother for only a few months, and that he had mental health problems. The court found that DCFS should fulfill its moral obligation to S.D. The court indicated that it did not think that the Juvenile Court Act (705 ILCS 405/2-1 et seq. (West 2004)) permitted reappointment of DCFS as S.D.'s guardian and that the court saw no avenue to do so.
On November 13, 2008, S.D. was found fit to stand trial. He pled guilty to aggravated robbery and the criminal court sentenced S.D. to mental health probation and his mother agreed to take him home.
On December 8, 2008, Haygood informed the juvenile court of the developments in S.D.'s aggravated robbery case. She testified that previous attempts at having S.D. live with his mom had proved unsuccessful and that it did not appear that she was capable of providing the level of care S.D. required. Haygood testified that Gardenia said S.D. could no longer stay with her for two reasons: his behavior, and the property damage he had caused in her section 8 housing. After the last court date in the criminal case, S.D.'s mother made an alternate care plan for S.D., and he resided with his former private guardian's daughter, Ms. J. Haygood testified that S.D. would no longer be able to stay with Ms. J because he had taken some personal items from Ms. J's husband and was no longer welcome there. Later questioning revealed that S.D. allegedly took a gun from the premises.
Haygood further testified that S.D. was taking two psychotropic medications and that her inquiry revealed that he had been taking the medication as prescribed. When asked if she knew where S.D. would stay that night, Haygood responded that she did not know, but that S.D. had a key to his mother's house. Haygood stated that Gardenia had been staying at her mother's house and that she told Haygood she planned to move and not reveal her address to Haygood or S.D. Haygood testified that S.D. could benefit from a more structured environment.
Haygood also testified that S.D. had had a physical altercation with his maternal grandfather, who required stitches. Haygood testified that she had previously appeared in court and reported to the court that S.D.'s mother did not want S.D. to return to her on any "sort of long-term basis or at all."
The assistant public guardian argued that an independent basis existed for placing S.D. in the custody of DCFS. DCFS argued that S.D. had been arrested three times since being returned to his mother's custody and that her decision not to allow S.D. to live with her was based on his criminal behavior, "not an independent basis."
The assistant State's Attorney argued that the court had authority to appoint DCFS as S.D.'s guardian and that S.D. needed help that DCFS could provide. The State and the Public Guardian filed written arguments requesting the court to appoint DCFS as S.D.'s guardian and detailing the court's authority to do so. The Public Guardian argued that the legislature intended to relieve the counties, which lack the child welfare expertise that DCFS has, of some financial burden by allowing a court to place a minor for whom an independent basis exists in the care of DCFS.
DCFS submitted written argument stating that any unwillingness of Gardenia to care for S.D. was not independent of S.D.'s criminal arrests and that there was therefore not an independent basis upon which to appoint DCFS S.D.'s guardian. DCFS *1049 urged the court to leave S.D. in his mother's custody.
On December 12, 2008, the court heard additional arguments and entered a modified dispositional order, modifying the November 20, 2007, order, finding it to be in S.D.'s best interest to be placed in the custody of DCFS. The court stated:
"[T]he court finds that an independent basis exists. In addition, the court takes judicial notice of testimony heard on December 8, 2008, the May 24, 1993 adjudication order finding of abuse and neglect and finds that this finding provides the court with an independent basis of abuse or neglect as required by 705 ILCS 405/2-27(d)."
The trial court went on to say that S.D.'s mother had not had custody of S.D. for a long time before he was returned home, that his issues and behavior problems become overwhelming for her based on her mental ability, and that in the court's view, "that's enough for me to do it; and in [S.D.]'s best interests, I am going to enter the order." The court based its decision on the "plain reading of the statute." The court further found that the portion of the statute that states "a minor for whom an independent basis of abuse, neglect, [or] dependency exists" was satisfied in the original order entered in this case, thus giving the court wide discretion to do what is in the best interests of S.D. S.D. was therefore ordered to be placed in the guardianship of DCFS. DCFS now appeals.

II. ANALYSIS
On appeal, DCFS argues that the trial court lacked the authority to appoint DCFS as S.D.'s guardian. Specifically, DCFS claims that the trial court lacked authority where S.D. was 17 years old, and had been charged with and convicted of a criminal offense, and that no independent basis existed upon which to appoint DCFS as guardian. The State and the Public Guardian both argue that an independent basis existed upon which to appoint DCFS as guardian. We agree with the State and the Public Guardian.

A. Standard of Review
As to the purely legal question of whether the Juvenile Court Act gave the trial court authority to appoint DCFS as S.D.'s guardian, the standard of review is de novo. In re U.O., 377 Ill.App.3d 964, 969, 317 Ill.Dec. 361, 881 N.E.2d 529 (2007).

B. Argument
Prior to June 1, 2008, section 2-27(1)(d) of the Juvenile Court Act simply read in relevant part:
"[A] minor charged with a criminal offense under the Criminal Code of 1961 or adjudicated delinquent shall not be placed in the custody or committed to the Department of Children and Family Services by any court * * *." 705 ILCS 405/2-27(1)(d) (West 2004).
Under this version of the statute, the trial court would not have had authority to appoint DCFS as S.D.'s guardian due to S.D.'s aggravated robbery charge under the Criminal Code. However, on June 1, 2008, the legislature amended the above language, and the statute now reads in pertinent part:
"[A] minor charged with a criminal offense under the Criminal Code of 1961 or adjudicated delinquent shall not be placed in the custody of or committed to the Department of Children and Family Services by any court, except * * * a minor for whom an independent basis of abuse, neglect, or dependency exists. An independent basis exists when the allegations or adjudication of abuse, neglect, or dependency do not arise from the same facts, incident, or circumstances which give rise to a charge or *1050 adjudication of delinquency." (Emphasis added.) 705 ILCS 405/2-27(1)(d) (West 2008).
The first issue we are thus faced with is whether an independent basis of abuse, neglect, or dependency, existed for S.D. Specifically, we must determine whether the allegations or adjudication of S.D.'s abuse, neglect, or dependency arose from a separate set of facts, incident, or circumstances separate from these that gave rise to S.D.'s charge of aggravated robbery. Because this particular issue has yet to be addressed since the amendment of section 2-27(1)(d) became effective, this is a case of first impression.
The fundamental objective of statutory construction is to ascertain and give effect to the intent of the legislature. In re Terrell L., 368 Ill.App.3d 1041, 1048, 307 Ill.Dec. 113, 859 N.E.2d 113 (2006). The best indicator of legislative intent is the statutory language. Terrell, 368 Ill. App.3d at 1048, 307 Ill.Dec. 113, 859 N.E.2d 113. "Courts should consider the statute in its entirety, keeping in mind the subject it addresses and the legislature's apparent objective in enacting it." Terrell, 368 Ill.App.3d at 1048, 307 Ill.Dec. 113, 859 N.E.2d 113. But a reviewing court's inquiry must always begin with the language of the statute itself, "which is the surest and most reliable indicator of the legislature's intent." Terrell, 368 Ill.App.3d at 1048, 307 Ill.Dec. 113, 859 N.E.2d 113. When the language of a statute is clear, it must be applied as written, with no further reliance on aids or tools of interpretation. Terrell, 368 Ill.App.3d at 1048, 307 Ill.Dec. 113, 859 N.E.2d 113. If the statutory language is plain, the court cannot read exceptions, limitations, or conditions into the statute that the legislature did not express. Terrell, 368 Ill.App.3d at 1048, 307 Ill.Dec. 113, 859 N.E.2d 113. Only when the meaning of the statute cannot be ascertained from the language may a court look beyond the language and resort to aids for construction. Terrell, 368 Ill.App.3d at 1048, 307 Ill.Dec. 113, 859 N.E.2d 113.
In the instant case, the trial court relied, in making its finding that an independent basis existed for S.D., on the juvenile court's adjudication order entered on May 24, 1993, and the testimony heard on December 8, 2008. The trial court stated in pertinent part:
"[T]he court finds that an independent basis exists. In addition, the court takes judicial notice of testimony heard on December 8, 2008, the May 24, 1993 adjudication order finding of abuse and neglect, and finds that this finding provides the court with an independent basis of abuse or neglect as required by 705 ILCS 405/2-27(d)."
DCFS argues, however, that the 1993 adjudication finding that S.D. was neglected and abused was too remote in time to qualify as an independent basis. DCFS further argues that the trial court's reliance on the adjudication was not a reasonable interpretation of section 2-27 as it "does not comport with the purposes of the [Juvenile Court] Act." DCFS claims that when the juvenile court reinstated Gardenia's wardship of S.D. on December 20, 2007, finding that Gardenia was fit, able, and willing to parent S.D., the 1993 adjudication of abuse and neglect should not have been relied upon to find an independent basis of abuse and neglect because the circumstances surrounding the 1993 adjudication had been corrected. We cannot agree with DCFS' contentions.
As stated above, our inquiry must always begin with the language of the statute itself. Terrell, 368 Ill.App.3d at 1048, 307 Ill.Dec. 113, 859 N.E.2d 113. When the language is clear, it must be applied as written, with no further reliance on aids or tools of interpretation. Terrell, 368 Ill. *1051 App.3d at 1048, 307 Ill.Dec. 113, 859 N.E.2d 113. Here, the language at issue states that a minor can be placed in the guardianship of DCFS, even if he or she has been charged with a crime, as long as there is an independent basis for which the trial court can find abuse, neglect, or dependency. The statute specifically defines an independent basis as allegations or an adjudication of abuse, neglect, or dependency not arising from the same facts and circumstances which gave rise to the criminal charge. See 705 ILCS 405/2-27(1)(d) (West 2008). Here, S.D. was previously adjudicated abused and neglected and taken out of his mother's custody in 1993. He was later charged with aggravated robbery for allegedly stealing an iPod on a bus. Thus, we agree with the trial court that the 1993 adjudication of abuse and neglect qualifies as an independent basis, as it did not arise from the same facts and circumstances which gave rise to S.D.'s aggravated robbery charge.
To the extent that DCFS argues that such finding does not comport with the purpose of the Juvenile Court Act, or that the trial court's modified dispositional order of 2008 reinstating wardship to Gardenia rendered the 1993 adjudication of abuse moot, we are unpersuaded. This court noted, in In re Jaron Z., 348 Ill. App.3d 239, 253-54, 284 Ill.Dec. 455, 810 N.E.2d 108 (2004), that once a trial court has adjudicated a minor abused or neglected, it maintains jurisdiction until the child "ages out" of the juvenile system or the trial court issues an order expressly stating that the case is closed and all proceedings are discharged. Here, neither event happened since the 1993 adjudication. Furthermore, the court in Jaron Z. found that a child's return home does not "reset" the procedural process of a case or somehow erase an earlier adjudication of abuse or neglect. Jaron Z., 348 Ill.App.3d at 254, 284 Ill.Dec. 455, 810 N.E.2d 108. The court specifically stated, that the fact "[t]hat the adjudication occurred years earlier is of no moment, as the trial court possessed a continuing jurisdiction over the children and to modify orders affecting the disposition of their case." Jaron Z., 348 Ill.App.3d at 254, 284 Ill.Dec. 455, 810 N.E.2d 108. Likewise here, we find that S.D.'s return to Gardenia's custody did not erase the 1993 adjudication. Accordingly, we find that the trial court properly found, based on the 1993 adjudication of abuse and neglect, that S.D. had an independent basis and therefore fit into the exception by which a minor charged with a crime could still be placed in DCFS' guardianship.
Even if the 1993 adjudication was somehow rendered moot by Gardenia's subsequent reinstatement of wardship, however, we would still find that S.D. had an independent basis of abuse and neglect, based on the December 8, 2008, hearing. During said hearing, DCFS caseworker Haygood testified that attempts at having S.D. live with his mother had proved unsuccessful and that it did not appear that she was capable of providing the level of care S.D. required. She testified that Gardenia said S.D. could no longer stay with her because of his behavior problems and because of the property damage that he had caused in her section 8 housing. The testimony presented revealed allegations of neglect on the part of Gardenia. Such allegations were independent of the circumstances surrounding S.D.'s aggravated robbery charge. Accordingly, the trial court properly found an independent basis of neglect for S.D. when it took judicial notice of the testimony presented at the December 8, 2008, hearing. We see no support for DCFS's contention that the testimony presented in the hearing did not establish an independent basis of abuse and neglect.
*1052 DCFS further argues, relying on In re A.A., 181 Ill.2d 32, 228 Ill.Dec. 905, 690 N.E.2d 980 (1998), that the trial court did not have the authority to place S.D. in the custody of DCFS, as it was against the intent of the legislature. DCFS cites to A.A. for the proposition that the General Assembly has broad discretion in amending the placement provisions to "`restrict the allocation of DCFS' scarce resources to its core population of abused, neglected, or dependent minors with no history of delinquency.'" See A.A., 181 Ill.2d at 39, 228 Ill.Dec. 905, 690 N.E.2d 980, quoting In re C.T., 281 Ill.App.3d 189, 196-97, 217 Ill. Dec. 219, 666 N.E.2d 888 (1996). And that "`delinquent minors aged 13 and older might present a danger to younger, more vulnerable children with whom they might be placed in foster homes and shelter care facilities.'" A.A., 181 Ill.2d at 39, 228 Ill.Dec. 905, 690 N.E.2d 980, quoting C.T., 281 Ill.App.3d at 196-97, 217 Ill.Dec. 219, 666 N.E.2d 888. However, a reading of the case reveals that A.A. does not stand for such propositions. Rather, the court in A.A. recognized that the exception at issue in this case had been added as part of an amendment during the pendency of that appeal. Our supreme court then explicitly rejected the State's argument that "because the legislature has now carved out an exception allowing delinquent teenagers to be placed in DCFS's temporary custody where there is an independent basis for finding abuse, neglect, or dependency, DCFS's younger charges are potentially exposed to older delinquents," (A.A., 181 Ill.2d at 39, 228 Ill.Dec. 905, 690 N.E.2d 980), stating:
"The legislature could rationally distinguish between teenage minors whose need for shelter care is directly related to their delinquency (for example, minors who have been ejected from their family homes because of delinquent behavior) and those whose delinquency is or was independent from the basis for finding abuse, neglect or dependency. The legislature could reasonably conclude that the former group poses a greater threat than the latter to young nondelinquent children in DCFS's temporary custody." In re A.A., 181 Ill.2d at 40, 228 Ill.Dec. 905, 690 N.E.2d 980.
Accordingly, we reject DCFS's argument that the intent of the legislature was not to place minors like S.D., whose delinquency was independent from the basis for finding abuse, neglect, or dependency, in DCFS's custody. Thus, we maintain that the trial court had proper statutory authority to place S.D. in DCFS's guardianship.

III. CONCLUSION
For the foregoing reasons, we affirm the judgment of the circuit court of Cook County. Judgment affirmed.
TULLY and HOWSE, JJ., concur.
NOTES
[1] A careful review of the record indicates that S.D. was charged with and pled guilty to aggravated robbery. However, there were no official documents included in the record which confirmed such charge and guilty plea.